# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

|  |  |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No.:  3:23-cv-2130 |
| v. | ) |
| | ) JURY TRIAL DEMANDED |
| **STEPHEN L. BAILEY,** | ) |
| **SAPPHIRE EXPLORATION, LLC, and** | ) |
| **HARRIS EXPLORATION, INC.,** | ) |
| | ) |
| Defendants | ) |
| | ) |

## <u>COMPLAINT</u>

Plaintiff Securities and Exchange Commission (the "Commission" or "SEC") alleges:

1.    From November 2017 through May 2023, Stephen L. Bailey ("Bailey") and his companies, Harris Exploration, Inc. ("Harris") and Sapphire Exploration LLC ("Sapphire") (collectively, "Defendants"), raised approximately $7.8 million from 51 individual investors across the country in at least seven unregistered securities offerings.

2.    Throughout that time period, Bailey, through Harris, Sapphire, and Sapphire's affiliates, offered and sold securities in the form of limited-partnership interests, promissory notes, common stock, and working interests in oil-and-gas wells.

3.    While assuring investors that their money would be used for specific business activities, Bailey misappropriated nearly $4.1 million for personal expenses and additionally misused over $900,000 for unauthorized purposes, including nearly $670,000 of undisclosed Ponzi-like payments to other investors.  Bailey also lied to investors by falsely claiming that Harris

had acquired an Oklahoma oil-and-gas company, and by falsely touting Sapphire's purportedly experienced management team.

4.      Through their actions, Defendants violated, and unless enjoined will continue to violate, the antifraud provisions of the federal securities laws, namely Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)].

5.      To protect the public from further harm and fraudulent activity, the SEC brings this action and seeks: (i) as to all Defendants, permanent injunctive relief and disgorgement of ill-gotten gains plus prejudgment interest; and (ii) as to Bailey alone, civil penalties, a conduct-based injunctions, a penny-stock bar, and an officer-and-director bar.

## DEFENDANTS

6.      Bailey, age 61, is a resident of Austin, Texas.  Bailey is the majority owner, managing member, and CEO of Sapphire.  He is also the Chairman, CEO, interim CFO, and major shareholder of Harris.  Bailey is a former CPA in Texas whose license expired in June 2003.

7.      Sapphire is a privately held Texas limited liability company based in Austin, Texas. Sapphire is controlled by Bailey.  It claims to be an oil-and-gas exploration company, but it primarily acquires oil-and-gas interests, and serves as the general partner or managing member of several related entities described below.

8.      Harris (a/k/a HXPN, Inc.) is a Nevada corporation based in Frisco, Texas that is controlled by Bailey.  Harris purportedly invests in emerging technologies and mineral resources, but its business primarily concerns the acquisition of oil-and-gas interests.  Harris's common stock trades on the OTC "Pink Sheets" Market under the ticker "HXPN."

## RELATED ENTITIES

9.     Sapphire Exploration III, LP ("Sapphire III") is a Texas limited partnership based in Austin, Texas.  It is managed and controlled by Bailey, through his control of Sapphire, which serves as Sapphire III's general partner.  Sapphire III offered and sold limited-partnership units to investors, and it continues to operate.

10.     Sapphire Exploration IV, LP ("Sapphire IV") is a Texas limited partnership based in Austin, Texas.  It is managed and controlled by Bailey, through his control of Sapphire, which serves as Sapphire IV's general partner.  Sapphire IV offered and sold limited-partnership units to investors.  Sapphire IV no longer operates and is currently defunct.

11.     Sapphire Exploration BBC LLC ("Sapphire BBC") is a Texas limited liability company based in Austin, Texas.  It is managed and controlled by Bailey, through his control of Sapphire, which serves as Sapphire BBC's managing member.  Sapphire BBC offered and sold unsecured convertible promissory notes to investors, and it continues to operate.

12.     Sapphire Exploration SLADOME LLC ("Sapphire SLADOME") is a Texas limited liability company based in Austin, Texas.  It is managed and controlled by Bailey, through his control of Sapphire, which serves as Sapphire SLADOME's managing member.  Sapphire SLADOME offered and sold unsecured convertible promissory notes to investors, and it continues to operate.

## JURISDICTION AND VENUE

13.     The Commission brings this action pursuant to its authority under Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)].

14.    This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 US.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), (e), and 78aa].

15.    In connection with the conduct described in this Complaint, Defendants, directly or indirectly, made use of the mails or the means or instruments of transportation or communication in interstate commerce, including but not limited to email, wiring of funds, and use of bank accounts.

16.    Venue is proper in this District because Harris moved its primary office to Frisco, Texas around August 2022, and the company had its principal place of business in Dallas during a significant portion of the misconduct described herein.  Further, acts, transactions, and courses of business constituting violations of the federal securities laws alleged in this Complaint occurred within this District, including Defendants' transmission and receipt of documents and proceeds that effectuated this scheme.

## FACTUAL ALLEGATIONS

**I.    Defendants' Securities Offerings**

### a.    Sapphire III Offering

17.    From approximately November 2017 through February 2018, Bailey and Sapphire offered and sold limited-partnership units in Sapphire III, raising approximately $1,273,250 from approximately 20 individual investors.  According to a term sheet,[1] Sapphire III was raising investor funds to acquire a working interest in a single well to be drilled in Jefferson Parrish, Louisiana, generally called "Dovetail."

---

[1] On information and belief, Bailey created and distributed to investors all of the offering documents, term sheets, investor communications, and press releases described in this Complaint.  Bailey had ultimate responsibility for the contents of all the offering documents, investor communications, and press releases described in the Complaint.

18.     The Sapphire III term sheet, dated November 8, 2017, states that Sapphire III was offering 20 total units, and that investor funds would be used for drilling and completion costs of the well: "Proceeds shall be used to purchase a 50% working interest in the [Dovetail] project…and shall include development costs (wells, production facilities, etc[.]) of the property."

19.     Under the heading "Total Amount To Be Raised," the Sapphire III term sheet states "$1,157,500.00 [for] drilling and completion costs at $57,875 per ownership unit, to be funded in two tranches of $31,875 . . . for drilling costs and, upon drilling success, $26,000 . . . for completion costs."

20.     As alleged further below, these statements concerning the use of proceeds were false because Bailey failed to disclose that he planned to use most of the investor funds for personal expenses and to make Ponzi-like payments to investors.

**b.  Sapphire BBC Offering**

21.     From approximately December 2018 through July 2021, Bailey and Sapphire offered and sold unsecured convertible promissory notes in Sapphire BBC, raising approximately $1,316,925 from approximately 20 individual investors.  According to a term sheet, Sapphire BBC was raising investor funds to conduct due diligence for the potential acquisition of interests in certain oil-and-gas-producing properties known as the Black Bay Complex ("BBC") in Louisiana.

22.     Under the heading "Use of Proceeds," the Sapphire BBC term sheet provides information about the BBC properties, and describes the various business activities and due diligence that Sapphire BBC will pursue to evaluate a potential purchase.  The Sapphire BBC term sheet further states that Sapphire BBC "will use the proceeds from the sale of the [n]otes for the pre-acquisition costs related to the purchase of the [p]roperties."

23.     Additionally, Sapphire BBC's note purchase agreements, executed by Bailey, contain a section titled "Use of Proceeds" stating that Sapphire BBC "will use the proceeds from the sale of the Notes for pre-acquisition due diligence expenses related to the Anticipated Purchase of [the BBC properties]."

24.     As alleged further below, these statements concerning the use of proceeds were false because Bailey failed to disclose that he planned to use most of the investor funds for personal expenses and to make Ponzi-like payments to investors.

### c.  Sapphire IV Offering

25.     From approximately June through November 2019, Bailey and Sapphire offered and sold limited-partnership units in Sapphire IV, raising approximately $299,400 from approximately 10 individual investors.  According to a term sheet, Sapphire IV was raising investor funds to acquire working interests in two wells to be drilled in Calcasieu Parrish, Louisiana, generally called the "OxBar" wells.

26.     The Sapphire IV term sheet, dated July 20, 2019, states that Sapphire IV was offering 100 total units, and will use the offering proceeds "to purchase an 80% working interest in the [OxBar] project . . . and shall include drilling, completion and production facilities costs of the property."

27.     Under the heading "Total Amount To Be Raised," the Sapphire IV term sheet further states "$3,340,000 for the drilling, completion and facilities costs of both wells at $33,400 per ownership unit, to be funded in two tranches of $19,960 (drilling costs) and, upon drilling success, $13,440 (completion and facilities costs)."

28.     As alleged further below, these statements concerning the use of proceeds were false because Bailey failed to disclose that he planned to use most of the investor funds for personal expenses and to make Ponzi-like payments to investors.

### d.  Sapphire SLADOME Offering

29.     From approximately August 2019 through September 2022, Bailey and Sapphire offered and sold unsecured convertible promissory notes in Sapphire SLADOME, raising approximately $900,000 from approximately 19 individual investors.  According to a project summary that Bailey emailed to prospective investors in August 2019, Sapphire SLADOME was raising investor funds to conduct due diligence for the potential acquisition of working interests in an oil-and-gas-producing field in Louisiana, commonly known as the South Louisiana Salt Dome (or "SLADOME").

30.     In Bailey's solicitation emails to investors, Bailey stated that "I want to raise capital to offset a portion of the pre-acquisition costs of evaluating and acquiring this property."

31.     Additionally, the note purchase agreements for Sapphire SLADOME, signed by Bailey, contain a section titled "Use of Proceeds" that states, "[Sapphire SLADOME] will use the proceeds from the sale of the Notes for pre-acquisition due diligence expenses related to the Anticipated Purchase of [the SLADOME property]."

32.     As alleged further below, these statements concerning the use of proceeds were false because Bailey failed to disclose that he planned to use most of the investor funds for personal expenses and to make Ponzi-like payments to investors.

### e.  Sapphire Offering of Promissory Notes

33.     Between approximately February 2018 and November 2020, Bailey and Sapphire offered and sold two promissory notes from Sapphire to two investors for approximately

$1,085,000.   One note was purchased by an investor for $575,000 and was generally unsecured. The other note, which was purchased by a second investor for $510,000, included a purported security interest in certain oil-and-gas reserves as collateral, and a personal guaranty from Bailey. Both notes promised 12% annual interest to the investors and had approximately three-year terms that were extended by agreement.

34.    As alleged below in paragraphs 53-55, Bailey made a Ponzi-like payment to redeem the unsecured note, including interest, by transferring investor funds received by Harris in connection with a separate offering to Sapphire.

### f.   Harris's Offerings of Common Stock

35.    From approximately November 2020 through February 2022, Bailey and Harris offered and sold common stock in Harris, raising approximately $750,000 from approximately nine individual investors.  Bailey used two different private placement memoranda ("PPMs") for the offerings, and both PPMs indicate that all offering proceeds would be used for specific business purposes.  Bailey created both PPMs and distributed them to potential investors.

### i.   Nevada Project

36.    The first PPM, dated January 4, 2021 (the "January PPM"), states that Harris was raising up to $1 million to fund certain expenses for the future purchase and development of a Nevada property that purportedly contained gold mineral reserves.

37.    The January PPM discloses that Harris will provide the necessary drilling capital to determine the proven mineral reserves, and that it will raise additional funds for the acquisition and drilling activities through a subsequent debt offering.

38.    Under the heading "Use of Proceeds," the January PPM states that investor funds would be used in the following ways: (1) $150,000 for "pre-acquisition diligence" of the property;

(2) $600,000 for the "drilling program bond issuance;" (3) $50,000 for "[l]egal for property acquisition;" (4) $70,000 for "corporate (office, legal, marketing, etc.);" (5) $100,000 for "[b]usiness consultants;" and (6) $30,000 for "[t]ravel." These detailed business expenses total $1 million, the total amount of investor funds to be raised in the offering.

### ii. Proposed Acquisitions of Company A and Company B

39.    The second PPM, dated October 8, 2021 (the "October PPM"), states that Harris was raising up to $1.5 million of investor funds for planned acquisitions of oil-and-gas companies. According to the PPM, Harris had "entered into non-binding agreements" to acquire interests in several companies, including Company A and Company B, two oil-and-gas development companies operating in and around Oklahoma.

40.    The October PPM states that the proposed acquisition of Company A involved recompletion projects for up to 15 of Company A's wells, and the acquisition of Company B involved drilling 10 new wells on Company B's lease in Oklahoma.

41.    Under the heading "Use of Proceeds," the PPM discloses how Harris will use the offering proceeds: (1) $600,000 for "[Company A] – [w]ell re-completions (12);" (2) $750,000 for "[Company B] – [i]nitial wells drilled (7-10);" (3) $75,000 for "[d]ue diligence (independent engineer report, etc[.]);" and (4) $75,000 for "[a]cquisition closing costs (legal, title, etc[.])." These detailed business expenses total $1.5 million, which equals the total amount of money to be raised in the offering.

42.    The October PPM also states that "[p]ending completion of the [o]ffering, all funds representing an investor's common stock purchase will be placed on deposit with [Harris] for immediate use pursuant to the Use of Funds [*sic*] schedule included herein."

43.    As alleged further below, these statements concerning the use of proceeds were

false because Bailey failed to disclose that he planned to use most of the investor funds for personal expenses and to make Ponzi-like payments to investors.

### g. Harris's Offering of Participation Interests in Company A's Recompletion Wells

44.    From approximately January through October 2022, Bailey and Harris offered and sold working interests in 15 of Company A's existing wells (called participation interests), raising approximately $1,275,000 from approximately ten individual investors.

45.    Bailey sent an email to prospective investors on or around January 11, 2022 in which he stated that Company A had identified 15 existing wells for recompletion, and that recompletion costs were budgeted at $100,000 for each well, requiring total capital of $1.5 million for the recompletion project.  According to Bailey's email, the investor funds from this offering would provide half of the amount ($750,000), and the remainder would be funded from cash flow produced by the wells.

46.    As alleged further below, Bailey's statements concerning the use of proceeds were false because Bailey failed to disclose that he planned to use most of the investor funds for personal expenses and to make Ponzi-like payments to investors.

### h. Harris's Offering of Participation Interests in Bayou Villars Recompletion Wells

47.    From approximately June 2022 through May 2023, Bailey and Harris offered and sold participation interests in two wells in the Bayou Villars field in Jefferson Parish, Louisiana, raising approximately $640,000 from approximately ten individual investors.

48.    According to Bailey, Harris was raising the investor funds to purchase a working interest in the property, and to pay for the first well's recompletion costs.  In a June 22, 2022 email to investors, Bailey stated that the total offering would range from $390,000 to $520,000, with an

estimated $345,000 to $460,000 used to purchase a working interest in the property, and the remaining $45,000 to $60,000 used to recomplete the first well.

49.     As alleged further below, these statements concerning the use of proceeds were false because Bailey failed to disclose that he planned to use most of the investor funds for personal expenses and to make Ponzi-like payments to investors.

50.     In 2023, Bailey issued a cash call for the second well, and raised another $144,080 from investors to fund the well's recompletion costs.  When raising these funds, he failed to disclose that some of the proceeds would be used to pay for his personal expenses.

### i.   Bailey Raised an Additional $140,000 of Investor Funds

51.     Bailey raised and received approximately $140,000 of additional funds from investors that cannot be assigned to specific offerings due to Bailey's failure to keep records.  But all of these funds came from investors who purchased securities in several other fraudulent offerings alleged in this Complaint.  Additionally, Bailey commingled these investor funds with other offering proceeds, which were all generally misappropriated and misused as detailed below.

## II.   Bailey Misappropriated and Misused $5 Million of Investor Funds

52.     As alleged above, the offering documents for each individual offering state that all investor funds would be used to pay for specific investments and business expenses.  All of these disclosures were false because Bailey misappropriated and misused investor funds for personal expenses and to make Ponzi-like payments.

53.     In total, Bailey raised over $7.8 million of investor funds from the various offerings discussed above.  He misappropriated and misused approximately $5 million — or nearly 64% — of the total proceeds.  Bailey personally took nearly $4.1 million of the investor funds, including through payments to himself and other members of his family, personal travel, private school

tuition, meals and entertainment, firearms, massages, retail purchases, and gifts to colleges.

54.     Bailey also misused over $900,000 of investor funds, including nearly $670,000 in Ponzi-like payments to investors and over $245,000 in other unauthorized payments. For example, in January and February 2022, Harris received approximately $1 million of investor funds from its sale of participation interests in Company A's recompletion wells. Bailey promptly transferred nearly $800,000 of these funds to Sapphire, and then used $630,000 of these transferred funds to repay one of Sapphire's promissory notes, including interest, held by a different investor.

55.     Defendants never disclosed to investors the fact that most of their funds were being used to finance Bailey's extravagant lifestyle, or that a significant, Ponzi-like payment had been made to an existing investor directly from funds received from new investors.

### III.     Bailey's Material Misrepresentations Furthered Defendants' Fraudulent Scheme

56.     To further this fraudulent scheme to raise and misappropriate investor funds, Bailey misled investors by falsely touting Sapphire's management team on the company's website, and repeatedly misrepresenting Harris's failed attempt to acquire Company A.

#### a.     Bailey Lied About Sapphire's Management Team

57.     According to Sapphire's website, over which Bailey had ultimate authority, the company had "assembled a team of seasoned veterans in the areas of geological and geophysical science, reservoir engineering, and field operations" to operate its business. The website identified five key Sapphire executives and described their backgrounds, which included extensive experience in the oil-and-gas industry. The identified executives included a co-founder and president, and vice-presidents for "Geological & Geophysical," "Field Operations," "Reservoir and Production Engineering," and "Land, Legal" – all by name.

58.     These statements were false, as Bailey knew, because none of the listed men have

ever worked for Sapphire.

**b.  Bailey Lied About Harris's Purported Acquisition of Company A**

59.    Bailey misled investors about Harris's purported acquisition of Company A by making false statements in Harris's second PPM and several subsequent press releases.

**i.  False Statements in Harris's Second PPM**

60.    As alleged above in paragraphs 39-43, Bailey and Harris sought to raise $1.5 million in the second offering of common stock to fund specific costs for certain planned acquisitions, including $600,000 that was designated for Harris's purported acquisition of Company A.

61.    The October PPM states that "[Harris] has recently agreed to terms for the purchase of a [75%] interest in [Company A], based in Morris County, Oklahoma.  [Harris] will 'earn' its interest by providing the necessary capital to advance [Company A's] exploration and production objectives."

62.    The October PPM further states that the Company A transaction was expected to close before year-end 2021.

63.    In fact, as Bailey knew at the time, these two statements were false.  Harris did not have an agreement to purchase any interest in Company A.  Moreover, Bailey had no reasonable expectation that Harris could close a transaction to purchase a 75% interest in Company A before the end of 2021.

64.    During 2021, Bailey had informed Company A's owners that Harris wanted to purchase interests in some of Company A's wells, and Harris provided approximately $300,000 of investment capital to help Company A start recompleting those wells.  However, Harris and Company A's owners had not reached an agreement on Harris's proposed transaction to purchase

interests in some of Company A's wells. Additionally, there was no agreement for Harris to purchase an *equity* interest in Company A, as falsely stated in the October PPM. In fact, as alleged further below, Harris and Company A never reached a final agreement on *any* proposed transactions.

### ii. False Statements in Harris's December 2021 Press Release

65.     On December 2, 2021, Harris issued a press release announcing that it had signed a letter of intent to acquire a 75% equity interest in Company A. Bailey prepared this press release and had ultimate authority for it.

66.     Among other things, the press release stated that, "[Harris] . . . today announced that it has signed a letter of intent with [Company A], an Oklahoma-based oil and gas exploration company, to acquire 75% of the equity interest of [Company A]." According to the press release, the parties were currently performing due diligence and expected to close the transaction by December 31, 2021. The release also quotes Bailey, as President and CEO of Harris, who expressed the company's excitement to work with Company A.

67.     In fact, as Bailey knew, there was no signed letter of intent between Harris and Company A in December 2021. Although the companies were exploring Harris's proposed well-interest transaction with Company A, they did not sign an actual letter of intent until January 31, 2022, nearly two months after the December 2, 2021 press release was published.

68.     Bailey also provided a link to this false press release when he subsequently emailed investors about purchasing participation interests in Company A's recompletion wells. Bailey's email, dated January 11, 2022, also stated that Harris "has an agreement on the table to acquire a 75% interest in [Company A] . . . ." This statement was also false or misleading because, as noted above, Harris did not have a signed letter of intent with Company A's owners until January 31,

2022, nearly three weeks after Bailey's email.

69.    These statements were false for the additional reason that there was no "agreement . . . to acquire a 75% interest in [Company A]."  Company A's owners had only contemplated selling working interests in the recompletion wells in exchange for Harris's agreement to fund the recompletion costs.

70.    After Harris published this release on December 2, 2021, Bailey sold nearly $1.3 million of participation interests in Company A's recompletion wells.

### iii.    False Statements in Harris's April 2022 Press Release

71.    On April 18, 2022, Harris published another press release and stated that it *completed* its acquisition of Company A.

72.    According to the press release, "[Harris] . . . today announced that it has completed its due diligence and executed closing documents with regard to its investment in [Company A], the Oklahoma-based oil and gas exploration company in whom [Harris] has acquired a 75% equity interest."  The release also lists Bailey as Harris's President.

73.    In fact, Harris had not executed closing documents to purchase *any* interest in Company A or its wells.  In the end, Bailey and Company A's principals never reached an agreement about the specific terms of any transaction.

### iv.    False Statements in Harris's October 2022 Press Release

74.    On October 14, 2022, Harris published a third press release concerning Company A.  The press release, which names Bailey as Harris's president, falsely states that "[Harris] owns 75% of [Company A]".

75.    As explained above, Harris never purchased an equity interest in Company A because Bailey and Company A's principals never reached an agreement about the specific terms

of any transaction.

## CLAIMS FOR RELIEF

## <u>FIRST CLAIM FOR RELIEF</u>

### Fraud in Connection with the Purchase or Sale of a Security

### Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]

#### *Against All Defendants*

76.    Plaintiff re-alleges and incorporates paragraphs 1 through 75 of this Complaint by reference as if set forth verbatim in this Claim.

77.    By engaging in the acts and conduct alleged herein, Defendants, directly or indirectly, in connection with the purchase or sale of securities, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, knowingly or with severe recklessness:

a.    employed a device, scheme, or artifice to defraud; and/or

b.    made an untrue statement of a material fact, or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

c.    engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit upon any person.

78.    By reason of the foregoing, Defendants violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

### Fraud in the Offer or Sale of a Security

### Violations of Sections 17(a) of the Securities Act
### [15 U.S.C. § 77q(a)]

### *Against All Defendants*

79.     Plaintiff re-alleges and incorporates paragraphs 1 through 75 of this Complaint by reference as if set forth verbatim in this Claim.

80.     By engaging in the acts and conduct alleged herein, Defendants, directly or indirectly, in the offer or sale of a security, by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, have:

      a.     knowingly or with severe recklessness employed a device, scheme, or artifice to defraud; and/or

      b.     knowingly (or with severe recklessness), recklessly, or negligently obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

      c.     knowingly (or with severe recklessness), recklessly, or negligently engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon the purchaser.

81.     By reason of the foregoing, Defendants have violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a judgment:

1.    Permanently enjoining the Defendants from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

2.    Permanently barring Defendant Bailey from, directly or indirectly, including but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent Bailey from purchasing or selling securities listed on a national securities exchange for his own personal account;

3.    Permanently barring Defendant Bailey from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock. A penny stock is any equity security that has a price of less than five dollars, except as provided in Rule 3a51-1 under the Exchange Act [17 C.F.R. § 240.3a51-1];

4.    Permanently enjoining Defendant Bailey from serving as an officer or director of any issuer required to file reports with the SEC under Section 12(b), 12(g), or 15(d) of the Exchange Act [15 U.S.C. §§ 78l(b), 78l(g), and 78o(d)], pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

5.    Ordering the Defendants to disgorge all ill-gotten gains received as a result of the violations alleged herein, plus prejudgment interest on those amounts, pursuant to the Court's equitable powers and Sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), (5), and (7)];

6.      Ordering Defendant Bailey to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

7.      Imposing such other and further relief as the Court may deem just and proper.


Dated:  September 25, 2023                    Respectfully submitted,

                                              Matthew J. Gulde
                                              Illinois Bar No. 6272325
                                              United States Securities and
                                              Exchange Commission
                                              Burnett Plaza, Suite 1900
                                              801 Cherry Street, Unit 18
                                              Fort Worth, TX  76102
                                              Telephone: (817) 978-3821
                                              Facsimile: (817) 978-4927
                                              guldem@sec.gov

                                              ATTORNEY FOR PLAINTIFF SECURITIES
                                              AND EXCHANGE COMMISSION